UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELE VANDERPOOL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15-CV-538 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.   Procedural History

Plaintiff Michele Vanderpool filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, on March 1, 2012, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, on March 2, 2012, with an alleged onset date of May 31, 2007. (Tr. 107–22). After plaintiff's applications were denied on initial consideration (Tr. 53–62), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 65–69).

Plaintiff and counsel appeared for a hearing on September 16, 2013. (Tr. 26–49). At the hearing, plaintiff amended her alleged onset date to March 2, 2012. (Tr. 139). The ALJ issued a decision denying plaintiff's applications on November 4, 2013. (Tr. 6–25). The Appeals Council denied plaintiff's request for review on January 30, 2015. (Tr. 1–4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. <u>Evidence Before the ALJ</u>

### A. <u>Disability Application Documents</u>

In the Disability Report completed by the Field Office dated March 2, 2012 (Tr. 143–47), the interviewer noted that plaintiff appeared appropriately dressed and groomed.  She read a book while waiting in the lobby to speak with a claims representative.  At the interview desk, plaintiff did not seem to have any difficulty communicating with the claims representative.

In the Function Report plaintiff completed on March 13, 2012 (Tr. 160–70), plaintiff wrote that she lived alone with her husband in a mobile home.  She attempted to do housework if her back and neck were not bothering her.  Plaintiff mostly sat or lay around the house watching television or reading books during the day.  If she did not have to go somewhere, plaintiff did not get dressed.  If she was able to, she fixed supper when her husband came home and then watched television with him until bedtime.  Plaintiff woke up frequently throughout the night, because of pain.  Plaintiff helped take care of pet dogs by letting them in and out of the house while her husband fed and gave them water.

With regard to personal care, plaintiff stated it was painful for her to stand in the shower, brush her hair at times, and bend over to shave her legs.  She did not have problems feeding herself or using the bathroom.  Three to four times a week, plaintiff made one-course meals in a crockpot, oven, or microwave.  Plaintiff stated that she needed her husband to remind her to take her medicine.  As to housework, plaintiff did the laundry and cleaned.  However, if she was in pain, she "d[id]n't do anything." (Tr. 162).  It took plaintiff about eight hours to clean the house once a week, but it sometimes took more than one day.  Her husband did all of the

yardwork.  Plaintiff could drive a car, but she sometimes rode with someone else if she needed to go somewhere.  Sometimes plaintiff did not drive because her neck hurt to such an extent that she could not turn her neck.  Plaintiff did not have trouble going out alone and did not need reminders to go places.  She shopped for groceries in stores once a week.  Plaintiff was capable of paying bills, counting change, and using a checkbook or money orders.

Plaintiff's hobbies and interests included reading and watching television, which had not changed since the onset of her health conditions.  On the weekends, she played card games with her family.  Plaintiff had problems getting along with others when she was in pain, because she became cranky and preferred to stay at home where she could lie down and not be bothered.  Plaintiff wrote that her physical conditions hurt her neck and beck when lifting, bending, standing, reaching, walking, sitting, or climbing stairs for too long.  She could walk for an hour or longer before needing a rest.  She had normally had no limitations in her ability to pay attention, except when she was in pain.  Plaintiff could follow written instructions and sometimes spoken instructions if she heard what was said.  She needed a hearing aid but she could not afford one.  Plaintiff got along well with authority figures and had never been fired or laid off from a job.  Her muscles became tense and started to hurt when she became stressed.  She stated that she repeatedly checked to make sure things were turned off and unplugged before leaving the house.

In the Work History Report plaintiff completed on March 13, 2012 (Tr. 148–59), she noted that she had most recently worked as a bus monitor for a special needs bus service from 2005 to May 2007, as an assembler at a shoe factory in

2004, as a deli worker at a grocery store in 2003, as an assembler at valve and circuit board factories from 1997 to 2001, as an assembler of children's toys from 1993 to 1996, as a hostess at a restaurant for several months in 1993, as a cashier at a clothing store for several months in 1993, as a cashier at Wal-Mart from 1991 to 1992, and as an assembler at a business form factory from 1990 to 1991.

In the undated Disability Report plaintiff completed (Tr. 171–77), plaintiff listed her medical conditions as cervical disc disease with radiculopathy and hearing loss in both ears. She was 5'7'' and weighed 197 pounds. Plaintiff did not stop working because of her conditions, but because her previous employer lost its contract and she decided to stay home to take care of her handicapped father-in-law. Plaintiff stated that she had been in special education classes in grade school and in junior high school. The Missouri Department of Elementary and Secondary Education was unable to produce any special education records for plaintiff, noting that the records are destroyed after seven years. (Tr. 142).

## B. Testimony at the Hearing

At the hearing on September 16, 2013, plaintiff testified that she lived in a mobile home with her husband who worked full-time. (Tr. 29). Plaintiff had a 12th grade education. From 2007 to 2009, plaintiff took care of her handicapped father-in-law on an unpaid basis. (Tr. 30). Plaintiff decided to apply for disability benefits in March 2012 after discovering from an MRI and an x-ray that she had cervical disc disease. (Tr. 31). Daily radiating pain in her neck and arms made it impossible for her to hold anything or pick up anything. (Tr. 32). Plaintiff stated that she could sit for roughly fifteen minutes before she needed to shift around and rub her neck. If she was at home, she would lie down about a third of the day. When she was up

moving around at home, she felt pain radiating down her upper neck and back after fifteen minutes. (Tr. 33). Pain medications provided some relief for the pain in her neck.

The pain going down plaintiff's arms occurred daily, but not constantly. (Tr. 34). Lifting and sitting straight up tended to cause the pain in her arms to begin. Sometimes when she was reading a book, she could not hold it and dropped it. Plaintiff reported problems with her hearing and needed the television to be very loud for her to hear it. Background noise made it impossible for her to hear. She also read lips and sometimes asked people to repeat themselves. Plaintiff had been prescribed a hearing aid, but could not afford to purchase one. A previous hearing aid had burned up in her parents' house. (Tr. 41).

Plaintiff reported receiving medical care for mental health issues. (Tr. 37). Plaintiff experienced symptoms of anxiety, such as becoming nervous and having difficulty breathing when she had to talk in front of people. (Tr. 38). Plaintiff also had issues with "things being out of place," did not like to use public restrooms, and did not like to leave home. When she did leave home, she had to triple check everything to make sure everything was unplugged and turned off before she could find peace of mind. When plaintiff felt anxious, she had difficulty doing the dishes and laundry and wanted to be alone. These symptoms occurred usually four days out of the week. (Tr. 39). Money issues also made plaintiff depressed. Plaintiff's husband had had to miss work to be with her, which made it harder on the couple financially. Depression caused plaintiff to feel a knot in her chest and to have crying spells. (Tr. 40).

Plaintiff also testified that she was receiving radiation treatment for thyroid cancer. Pain medications and the antidepressant plaintiff took made her feel sleepy. Neither plaintiff nor her husband had health insurance. (Tr. 41). On the average day, plaintiff read, watched television, and washed dishes if she felt well enough. However, plaintiff had difficulty standing for too long while doing the dishes. She sometimes vacuumed the house, but the vibration of the vacuum radiated pain up her arm into her neck. Her husband took care of their property and lawn care. Plaintiff sometimes went grocery shopping, but never alone since she could not lift or reach for heavy objects on higher shelves. (Tr. 42). When she felt depressed, she did not feel like taking a shower or caring for her personal hygiene. (Tr. 43). Plaintiff had gained about 30 pounds since the onset of her conditions.

Tracy Horwin Young, M.A., a vocational expert, provided testimony at the hearing. Ms. Young first classified plaintiff's work experience in accordance with the Dictionary of Occupational Titles and Selected Characteristics of Occupations based on plaintiff's work history report. (Tr. 44). Plaintiff's work as a school bus monitor was classified as a light, unskilled job with a specific vocational preparation (SVP) of two. Her work as a shoe packer was light, unskilled labor with an SVP of two. Her work as a shoe cleaner was medium, unskilled labor with an SVP of two. Plaintiff's work as a deli cutter or slicer was a light, unskilled job with an SVP of two. Her inspector packager job was a medium, unskilled position with an SVP of two. Plaintiff's work as a leveler of printed circuit boards was a light, semi-skilled job with an SVP of three. Finally, her unpaid position as a caregiver was a medium, unskilled job with an SVP of three.

The ALJ asked Ms. Young about the employment opportunities for an individual of plaintiff's age, education, and work experience, who retained the residual functional capacity for light exertional work, should avoid ropes, ladders and scaffolding, should avoid hazardous heights, could occasionally perform jobs that have a high vibration level, and was limited to unskilled work. The vocational expert testified that such a person could perform plaintiff's past relevant work as a bus monitor, shoe packer, and deli cutter or slicer. Ms. Young stated that such a person could also perform the additional jobs of a fast food worker, cashier, and housekeeping cleaner. (Tr. 46).

On cross-examination, plaintiff's attorney asked Ms. Young to further limit the hypothetical individual to someone who needed the options to change between sitting and standing or walking every 30 minutes throughout the workday and to take a break to lay down or recline in the workplace the equivalent of one extra break a day for 15 to 20 minutes at a time. Ms. Young stated that such a person could not work any of the positions she had mentioned or engage in any other work with the extra break. (Tr. 46–47). Plaintiff's attorney next asked Ms. Young to include the limitations that the hypothetical individual would need the option to change between sitting and standing or walking every 30 minutes, would be precluded from interacting with the general public but could occasionally interact with coworkers and supervisors, and could only occasionally push, pull or reach with the upper extremities. Ms. Young testified that such a person would be precluded from all unskilled work.

## C. <u>Medical Records</u>

In December 2007, plaintiff was diagnosed with a left-sided ectopic pregnancy per an ultrasound. (Tr. 214–35). An exploratory laparotomy was performed and plaintiff underwent a partial left salpingectomy at Barnes Jewish Hospital. Pre-surgery plaintiff was provided crisis intervention, grief facilitation and supportive dialogue from a hospital chaplain. Plaintiff was discharged two days after her operation and prescribed Percocet[1] and Motrin[2] for pain, Colace[3] for constipation, and iron sulfate for anemia.

At her post-operation check with Sara Nicholas, M.D. at Barnes Jewish Hospital on December 28, 2007, plaintiff complained of abdominal pain at both sides of the incision from the surgery. (Tr. 245–51). She also complained of tearfulness nearly every day since the surgery. Plaintiff had been able to go about her activities of daily living and talk to family and friends about her loss, however. Dr. Nicholas noted that plaintiff's medical history included central hearing loss in her right ear due to meningitis as a child. Upon a review of plaintiff's systems, the doctor noted that plaintiff had occasional dizziness, swelling in both of her legs relieved by elevation, and depression. The sutures from plaintiff's operation were removed, lab tests were performed, and her pain medication was refilled. Because plaintiff remained slightly anemic since her surgery, a prescription for iron sulfate was provided.

With respect to plaintiff's mood, Dr. Nicholas had a long discussion with plaintiff and her mother-in-law regarding the grieving process and suspected that

---

[1] **Error! Main Document Only.**Percocet is a combination of Oxycodone and Acetaminophen. Oxycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See <u>Phys. Desk. Ref.</u> 1114 (60th ed. 2006).

[2] Motrin, or ibuprofen, is a nonsteroidal anti-inflammatory drug used to relieve mild to moderate pain. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682159.html.

[3] **Error! Main Document Only.**Colace is a stool softener. <u>See</u> http://www.nlm.nih.gov/medlineplus/druginfo /meds/a601113.html (last visited on June 26, 2015).

plaintiff's symptoms at this point represented normal grief, since this was a desired pregnancy after years of infertility. Plaintiff had now had both fallopian tubes removed and her chance of future pregnancies was slim. Dr. Nicholas told plaintiff to return in three weeks for a follow-up appointment.

At plaintiff's follow-up appointment with Dr. Nicholas on January 16, 2008, she reported that her abdominal pain at the surgery incision had improved since the last visit. (Tr. 242–44). Plaintiff also reported mild, diffuse, intermittent pain involving both of her flanks and epigastrium. Dr. Nicholas opined that this pain was likely due to peritoneal irritation from hemoperitoneum at the time of surgery and expected this to slowly improve. Based on reports of severe cramping with menstruation, Dr. Nicholas diagnosed plaintiff with fibroid uterus and prescribed hormone therapy to reduce her symptoms. The doctor noted that plaintiff's chance of spontaneous pregnancy was nearly zero at this point, but although she desired a pregnancy, she was not financially able to undergo assisted reproduction techniques. Plaintiff's tearfulness had only minimally improved since her last visit. Plaintiff expressed a lack of desire to participate in once enjoyable activities, decreased appetite, low energy, and difficulty sleeping. Dr. Nicholas determined that plaintiff likely had depression and started her on Celexa.[4] Her thyroid hormone levels were within normal limits, but her Beck Depression Inventory score was consistent with severe depression. Plaintiff was instructed to return for a follow-up appointment in six months or sooner as needed.

In a letter dated May 19, 2009 (Tr. 366–68), a clinical audiologist wrote that plaintiff had moderate left sensorineural hearing loss and no measurable hearing in

---

[4] **Error! Main Document Only.**Celexa, or Citalopram, is prescribed to treat depression. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

her right ear based on the most recent hearing test on file for plaintiff from December 1996.  On December 16, 2009, plaintiff visited Jennifer Barbin, M.D.'s office with an abscess near her axilla with associated lesion discharge.  (Tr. 320–22).  Plaintiff's symptoms were not relieved by antibiotics.  General physical inspection revealed abscess status post-surgical fistulation with a wound that was healing well, no drainage, and slight bruising.  Dr. Barbin told plaintiff to discontinue Tetracycline,[5] start on Doxycycline[6] twice a day for two weeks, keep her wound clean and dry, complete lab testing, and follow-up in one month.  A culture of the wound showed very light growth, gram positive cocci.  (Tr. 363–65).

On April 6, 2010 (Tr. 266–68, 317–19), plaintiff presented to Dr. Barbin's office with a persistent cough, right ear pain, and sneezing.  Plaintiff was diagnosed with an upper respiratory tract infection, given Ciprofloxacin[7] 500 mg twice a day and Loratadine[8] 10 mg for allergies, placed on a trial of Ranitidine[9] 150 mg twice a day for her gastroesophageal reflux disease (GERD), and told to follow up in four to six months.  At a gynecological examination with Roger Rembecki, M.D. on April 14, 2010 (Tr. 329–32), plaintiff was positive for dysmenorrhea,[10] fibroids,[11] infertility,

---

[5] Tetracycline is an antibiotic used to treat bacterial infections, including skin infections. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682098.html (last visited September 11, 2015).

[6] Doxycycline is an antibiotic used to treat bacterial infections, including skin infections. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682063.html (last visited September 11, 2015).

[7] **Error! Main Document Only.**Ciprofloxacin is a synthetic broad-spectrum antimicrobial agent. Phys. Desk Ref. 3073 (64th ed. 2010).

[8] Loratadine is an antihistamine used to temporarily relieve the symptoms of hay fever and other allergies.  https://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html (last visited September 11, 2015).

[9] **Error! Main Document Only.**Ranitidine is indicated in treatment of duodenal ulcer, GERD, and erosive esophagitis.  See Phys. Desk Ref. 1633-35 (65th ed. 2011).

[10] Menstrual cramps.  https://en.wikipedia.org/wiki/Dysmenorrhea (last visited September 15, 2015).

[11] Fibroids are the most common benign tumors in women of childbearing age. https://www.nlm.nih.gov/medlineplus/uterinefibroids.html (last visited September 15, 2015).

menorrhagia[12] and menses. Dr. Rembecki discussed treatment options with plaintiff and she opted for a laparoscopic supracervical hysterectomy. Her Pap smear test was negative for intraepithelial lesion or malignancy. (Tr. 348). Post-operation plaintiff had some tugging and discomfort at the right trocar site at the semilunmar line and was positive for surgical amenorrhea. (Tr. 326–28). Dr. Rembecki determined to allow for additional healing time and referred plaintiff for right paramedian lateral abdominal wall defect.

At an office visit with Dr. Barbin on June 16, 2010 (Tr. 263–65, 314–16), plaintiff presented with a sore throat unrelieved by cough drops and a spray. A strep test was negative. Dr. Barbin prescribed plaintiff Ciprofloxacin and instructed plaintiff to gargle warm salt water and drink plenty of fluids. On September 27, 2010, plaintiff visited Dr. Barbin for complaints of a sore throat, nasal congestion and diarrhea. (Tr. 260–62, 311–13). Dr. Barbin diagnosed plaintiff with an acute upper respiratory infection, not otherwise specified and prescribed Ciprofloxacin and a flu shot. On December 6, 2010, plaintiff presented to Dr. Barbin's office for the removal of sutures from a dog bite and numbness in the tips of her fingers in her right hand. (Tr. 257–59, 308–10). Plaintiff's medications at that time included Vicodin 5 mg-500 mg four times a day, Zolpidem[13] Tartrate 10 mg at bedtime, Fexofenadine[14] HCl 60 mg twice a day, Omeprazole[15] 20 mg once or twice a day,

---

[12] Heavy menstrual bleeding. http://www.cdc.gov/ncbddd/blooddisorders/women/menorrhagia.html (last visited September 15, 2015).
[13] **Error! Main Document Only.**Zolpidem is a sedative-hypnotic used to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693025.html (last visited on Sept. 1, 2011).
[14] Fexofenadine is an antihistamine used to relieve the symptoms of seasonal allergic rhinitis. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a697035.html (last visited September 15, 2015).
[15] **Error! Main Document Only.**Omeprazole is used alone or with other medications to treat ulcers, gastroesophageal reflux disease (GERD), and erosive esophagitis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html (last visited on May 25, 2010).

Ranitidine 150 mg twice a day, and green tea slim. Wound care was performed and plaintiff's sutures were removed. Dr. Barbin placed plaintiff on a trial of Ambien for her insomnia and told her to allow 2 to 4 weeks for her hand wound to heal.

At the next office visit with Dr. Barbin on March 2, 2011, plaintiff had cold symptoms, left thumb pain, right wrist numbness and weight loss. (Tr. 254–56, 305–07). She was diagnosed with an acute upper respiratory tract infection, advised to use a wrist split, prescribed anti-inflammatory drugs for pain, and instructed to diet and exercise to lose weight. On March 18, 2011, plaintiff first complained of depression and obsessive compulsive disorder to Dr. Barbin. (Tr. 302–04). Plaintiff reported that it was somewhat difficult for her to meet home, work or social obligations, and she was experiencing anxious, fearful thoughts and a depressed mood. Plaintiff's father had died nine years ago, but his funeral was tomorrow and memories were coming back to her. Dr. Barbin started plaintiff on Celexa, but told her that if things did not improve, she would need to see a psychiatrist.

On May 10, 2011, Elissa Lewis, Ph.D. completed a Psychiatric Review Technique for plaintiff. (Tr. 280–91). Dr. Lewis indicated that plaintiff had the medically determinable impairment of depression. Dr. Lewis opined that plaintiff's mental impairments were not severe. Plaintiff had no restrictions of daily living activities, no difficulties maintaining social functioning, no difficulties maintaining concentration, persistence and pace, and no repeated episodes of decompensation. The doctor based her opinion on a review of the medical records and found that plaintiff's statements of her mental functional limitations were not credible because they were not consistent with the medical evidence. Plaintiff had had only one

documented episode of depressive exacerbation in her file after suffering a miscarriage, had no ongoing psychiatric treatment history and no institutionalizations, and had not mentioned depressive symptoms to medical providers. As such, plaintiff's condition was not severe.

Plaintiff returned to Dr. Barbin's office on September 26, 2011 with a puncture wound on her right thumb from a dog bite and a vaginal yeast infection. (Tr. 299–301). Plaintiff was prescribed Diflucan for her yeast infection and lab tests were performed to rule out diabetes mellitus based on her Pap smear. Two days later plaintiff had her annual gynecological visit and was given a second dose of Diflucan for her vaginal itching. (Tr. 323–35). Her Pap test was negative for intraepithelial lesion or malignancy. (Tr. 347). Her mammogram showed a 6 millimeter focal asymmetry in the right breast that required further evaluation. (Tr. 337–38). Per radiology consultation, a mammography showed no persistent suspicious abnormality and the overall assessment was benign. (Tr. 336).

On January 9, 2012, plaintiff presented to Dr. Barbin's office with bilateral hand and arm pain and numbness. (Tr. 296–98). The pain started in her neck and radiated down both arms with numbness. Dr. Barbin ordered an x-ray of plaintiff's cervical spine and a nerve conduction velocity study of her hands. The x-ray showed mild degenerative disc disease at C6-C7, normal alignment in the neutral position with minimal anterolisthesis at C4-C5 with flexion and mild retrolisthesis with extension at C2-C3 and C4-C5. Clinical significance was uncertain. (Tr. 340, 465–66). An incidental note of bilateral cervical ribs at C7 was also made. A follow-up cervical MRI on February 9, 2012 indicated that degenerative changes predominated at C5-C6 and C6-C7. (Tr. 339, 463–64). A central bulging disc was

in the canal at C5-C6 and lateralization of changes into the foramen was on the right at C6-C7. There also was disc and osteophytic foraminal encroachment on the right and a focal disc protrusion lateralizing to the left within the canal at C6-C7. The radiologist noted that consultation for right or left C7 radiculopathy would be useful. The nerve conduction study and EMG examination performed on January 18, 2012 showed no abnormalities. (Tr. 341–44, 470, 484).

On June 19, 2012, plaintiff attended her husband's appointment with Dr. Barbin, presenting disability paperwork and complaints of anxiety and insomnia. (Tr. 405–09). For the disability paperwork, Dr. Barbin told plaintiff to set up an appointment with her nurse, Shannon, to fill it out. Plaintiff's anxiety symptoms were aggravated by conflict or stress at work or home, and she experienced fearful thoughts, restlessness, sluggishness, and sleep disturbance. Dr. Barbin placed plaintiff on a trial of Buspirone[16] 10 mg three times a day and gave her Ambien to use at bedtime as needed.

On June 29, 2012, Dr. Barbin signed a Physical Medical Source Statement for plaintiff. (Tr. 370–71). The statement indicates that plaintiff could frequently lift or carry less than five pounds. Plaintiff could stand or walk continuously for 30 minutes with a slow ambulation. She could stand or walk throughout an eight-hour day with usual breaks for less than one hour. The statement notes that plaintiff could sit continuously at one time for thirty minutes and could sit throughout an eight-hour day with breaks for less than one hour. The statement indicates that plaintiff must recline to diffuse her neck pain. Plaintiff was incapable of pushing or pulling due to cervical pain and pressure. Plaintiff could occasionally climb,

---

[16] **Error! Main Document Only.** Buspar, the brand name for buspirone, is used to treat anxiety disorders or in the short-term treatment of the symptoms of anxiety. http://www.nlm.nih.gov/med lineplus/druginfo/meds/a688005.html (last visited July 29, 2011).

balance, kneel, crouch, crawl, reach, handle, finger, and feel.  Plaintiff could never see, speak or hear.  Plaintiff could frequently stoop.  Plaintiff did not require the use of an assistive device for ambulation or balance.  The statement suggests that plaintiff should avoid moderate exposure to all environmental factors, such as extreme temperatures, vibration, hazards, and heights.  Plaintiff needed to lie down or recline to alleviate her pain symptoms for 15 minutes every 15 to 20 minutes during an 8-hour workday.  Plaintiff's pain and use of medications caused her drowsiness and decreased concentration.

At an appointment with Dr. Barbin on July 17, 2012 (Tr. 400–04), plaintiff complained of neck pain, disc disease, and right ear discomfort.  The doctor found that plaintiff's right ear wound was not infected since there was a scab formation and told her to allow it to heal on its own.  Her cervical disc disease was stable; however, because plaintiff continued to have pain, Dr. Barbin referred her to see a neurosurgeon.  Plaintiff had her annual gynecological examination on November 13, 2012.  (Tr. 393–99).  She had vaginal itching and breast tenderness.  The nurse practitioner gave plaintiff Diflucan for a yeast infection and Fioricet for pain as needed.  A lipid panel and thyroid-stimulating hormone reflex were ordered.  A mammogram compared to last year's exam was benign with no evidence of malignancy.  (Tr. 461).

In the emergency department of Missouri Baptist Hospital on December 16, 2012 (Tr. 456–60), plaintiff complained of dental pain in her lower back right tooth, unrelieved by pain medications.  Plaintiff was administered Bupivacaine and Norco, provided a Vicodin refill, and given an inferior alveolar nerve block.  Plaintiff stated that she felt much better, was diagnosed with a toothache and discharged.  An x-

ray to diagnose plaintiff's right knee pain on January 8, 2013 showed minimal spurring on the dorsal superior patella, but was otherwise within normal limits. Plaintiff reported right arm pain, bilateral knee pain, and problems with hyperlipidemia to Dr. Barbin on January 29, 2013. (Tr. 387–92). Dr. Barbin placed plaintiff on a trial of Meloxicam[17] 7.5 mg once or twice a day for arthralgia, low weight bearing exercises for strengthening, and Pravastatin[18] and a low cholesterol diet for her hyperlipidemia.

At an appointment with Dr. Barbin on May 7, 2013, plaintiff reported that her cervical disease was worsening and her arms were becoming number. (Tr. 379–86). Dr. Barbin offered to send plaintiff's imaging reports to a neurosurgeon in Jefferson City and refilled plaintiff's Meloxicam prescription. Plaintiff also reported that her irritability and anger were poorly controlled and Buspirone was not helping. Dr. Barbin recommended Prozac and a psychiatric referral. For plaintiff's headache, the doctor offered Fioricet for her to take as needed. Plaintiff also reported difficulty swallowing that had begun a month earlier. Dr. Barbin ordered an ultrasound of plaintiff's thyroid to rule out goiter.

A thyroid sonogram on May 8, 2013 revealed bilateral thyroid nodules, the largest being on the right with probable associated calcifications. (Tr. 453). Jaroslaw Michalik, M.D. ordered an ultrasound guided fine needle aspiration biopsy of plaintiff's thyroid. (Tr. 373–78). The fine needle aspiration revealed no obvious diagnosis. (Tr. 445–49). On July 22, 2013, plaintiff had a right thyroid lobectomy

---

[17] **Error! Main Document Only.**Meloxicam is a nonsteroidal anti-inflammatory used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. It can also be prescribed to treat ankylosing arthritis. http://www.nlm.nih.gov/medline plus/druginfo/meds/a601242.html (last visited on Nov. 4, 2014).

[18] Pravastatin is a statin used to slow the production of cholesterol in the body to reduce the risk of heart attack. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a692025.html (last visited September 15, 2015).

and isthmectomy, which revealed multifocal papillary carcinoma with BRAF mutation detected. (Tr. 419–21, 432–42). The maximum diameter of the largest focus of invasive tumor in the right thyroid was 2.3 centimeters. On July 29, 2013, plaintiff returned for a left thyroid lobectomy to complete total thyroidectomy. (Tr. 412–16, 427–30). Her left thyroid had papillary carcinoma measuring 8 millimeters. (Tr. 422–24). At a post-operation appointment with Dr. Barbin, plaintiff complained of some pressure and pulling in her neck, mild dysphagia, and tinging of her fingers and toes. (Tr. 492–96). Dr. Barbin instructed plaintiff to increase her calcium and vitamin D3 intake. Plaintiff's neck wound was clean, dry, and healing well.

In July 2013, plaintiff received medical treatment for an abscess on her right thigh that was treated with nonsteroidal anti-inflammatory drugs, a cool compress, and Clindamycin. (Tr. 498–513). Post-thyroid surgery, plaintiff was referred to medical oncology for further treatment. On August 21, 2013, Jason Li, M.D. opined that plaintiff was a good candidate for radioiodine operation therapy for the multifocal tumor in her right thyroid. (Tr. 410–11). For her left thyroid, Dr. Li opined that there was no role for systemic chemotherapy at that time. Dr. Li referred plaintiff to Humberto M. Fagundes, M.D., who also opined that plaintiff was a suitable candidate for post-operative radioiodine therapy (I-131). (Tr. 468–69, 518–19). After discussing the risks and benefits with plaintiff, she agreed to proceed. Plaintiff tolerated the first administration of I-131 well on September 12, 2013 and Dr. Fagundes scheduled her for a follow-up in one month. (Tr. 516–17).

### III.  The ALJ's Decision

In the decision dated November 4, 2013, the ALJ made the following findings:

1.   Plaintiff met the insured status requirements of the Social Security Act through September 30, 2008.

2.   Plaintiff has not engaged in substantial gainful activity since March 2, 2012, the amended alleged onset date of disability.

3.   Plaintiff has the following severe impairments of mild cervical degenerative disc disease, recent status post-bilateral thyroidectomy, obesity, and depression.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R 404.1567(b) and 416.967(b), except she must avoid rope ladders and scaffolds and avoid all exposure to hazards of heights and occasional exposure to high vibration.  She can understand, remember and carry out at least simple instructions and non-detailed tasks.

6.   Plaintiff is capable of performing past relevant work as a school bus monitor, shoe factory packer, and deli cutter, as this work does not require the performed of work-related activities precluded by plaintiff's residual functional capacity.

7.   Plaintiff has not been under a disability, as defined in the Social Security Act, from March 2, 2012, through the date of the ALJ's decision.

(Tr. 6–25).

## IV.   Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the

conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically

determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

 If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. <u>Discussion</u>

Plaintiff argues that the ALJ erred by failing to properly weigh the opinion of treating physician Dr. Barbin and that substantial evidence does not support the ALJ's RFC. In assessing plaintiff's RFC, the ALJ afforded little weight to the opinion of Dr. Barbin. (Tr. 15–16). Dr. Barbin completed a Physical Medical Source Statement for plaintiff on June 29, 2012 (Tr. 370–71), as summarized above. The ALJ provided several reasons for discounting Dr. Barbin's opinion. See Dolph v. Barnhart, 308 F.3d 876, 878–79 (8th Cir. 2002) (stating that an ALJ should "'give good reasons' for discounting a treating physician's opinion") (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).

First, the ALJ noted that Dr. Barbin did not opine as to a diagnosis, an onset date, or an estimation of how long the limitations were expected to last in her statement. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) ("[W]e have recognized that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'") (quoting Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010)). Also, the ALJ noted that Dr. Barbin's own office records did not support her findings. On the date plaintiff brought disability paperwork to Dr. Barbin to complete, treatment notes indicate that plaintiff was in no apparent physical distress. (Tr. 405–09). Shortly after completing the medical source statement for plaintiff, Dr. Barbin noted in her office records that plaintiff's cervical disc disease was stable. (Tr. 400–04). The doctor suggested a referral to a neurosurgeon to plaintiff, but plaintiff declined the referral and no evidence in the record indicates that plaintiff ever sought treatment from a neurosurgeon. At her next appointment with Dr. Barbin on January 29, 2013, plaintiff complained of right arm pain and bilateral knee pain, but did not mention any neck pain. (Tr. 387–92). Her physical exam was normal, and plaintiff had a full range of motion in both knees on that date. On May 7, 2013, plaintiff reported to Dr. Barbin that her cervical disc disease was worsening and she had found a neurosurgeon in Jefferson City, but there is no evidence that plaintiff ever sought or received treatment from a neurosurgeon. (Tr. 379–86). Dr. Barbin opined on that date that plaintiff's chronic conditions, including cervical disc disease, were stable. See Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (determining that the ALJ properly discounted the physician's medical source statement because the

statement contained limitations that "stand alone," did not exist in the physician's treating notes, nor were they corroborated through objective medical testing).

The ALJ also wrote that Dr. Barbin's opinion appeared to be based primarily on plaintiff's subjective complaints. (Tr. 19). In evaluating the medical evidence in the record, the ALJ found that plaintiff was not credible with regard to her allegations of disabling limitations of either a physical or mental nature. (Tr. 13–19). In discounting plaintiff's subjective complaints, the ALJ considered the objective findings in medical reports, plaintiff's activities of daily living, her testimony at the hearing, medications plaintiff took, and the duration, frequency and intensity of her symptoms. (Tr. 13–19); see Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Because the ALJ gave good reasons for discrediting plaintiff's testimony, supported by substantial evidence in the record, the Court will defer to the ALJ's credibility determination. See Gregg v. Barnhart, 354 F.3d 710, 713–14 (8th Cir. 2003).

Finally, the ALJ noted that Dr. Barbin was not a specialist. (Tr. 16); see Brown v. Astrue, 611 F.3d 941, 953 (8th Cir. 2010) ("Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist.") (quoting Thomas v. Barnhart, 130 Fed. Appx. 62, 64 (8th Cir. 2005)). Accordingly, the Court finds that the ALJ properly considered and gave little weight to Dr. Barbin's opinion as provided in the June 29, 2012 medical source statement. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2001) ("[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.") (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)); 20 C.F.R § 404.1527(d)(2)

(stating that the Social Security Administration uses medical sources as evidence of a claimant's impairments to reach a determination of disability, but "the final responsibility for deciding these issues is reserved to the Commissioner").

After considering the entire record, finding plaintiff's subjective statements not credible and giving little weight to Dr. Barbin's medical source statement, the ALJ determined that plaintiff had the RFC to perform light work, except that she should avoid ropes, ladders, and scaffolds, avoid all exposure to hazards of heights and occasional exposure to high vibration, and could understanding, remember and carry out at least simple instructions and non-detailed tasks. (Tr. 13–19). Plaintiff contends that the ALJ's RFC is not based upon substantial evidence in the record. However, in assessing plaintiff's RFC, the ALJ fully cited and discussed evidence throughout the record.

The ALJ noted that plaintiff did some housework, dishes, vacuuming, and laundry, fixed supper when she was able to, let the dogs in and out of the house, performed personal care, cooked, drove and went out alone, shopped for groceries, paid bills, read, and used a computer. (Tr. 12); Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."). The ALJ considered the normal or mild objective medical examination findings of plaintiff's x-rays, MRI, and nerve conduction studies. (Tr. 15); see Buckner, 646 F.3d at 558 ("Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'") (quoting Goff, 421 F.3d at 792).

As to plaintiff's mental conditions, the ALJ found that her diagnosis of anxiety was based on her own reports of mental impairment to her family physician, and she had not been treated by a mental health specialist nor had she required psychiatric hospitalization. (Tr. 17). Her depression was treated with medication prescribed by her primary care physician.

Overall, the ALJ found and explained numerous inconsistencies between treatment notes, opinion evidence, plaintiff's subjective statements, and objective medical findings. While plaintiff had some limitations, the ALJ concluded that her limitations did not render her disabled and she was capable of performing past relevant work. (Tr. 19). Upon review of the record, the Court concludes that substantial evidence supports the ALJ's findings.

## VI. <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 7th day of March, 2016.